**UNITED STATES of America**

v.

**Carlos GONZALEZ, Defendant.**

**No. 99 CR. 1113(SAS).**

United States District Court,
S.D. New York.

July 23, 2003.

Roger L. Stavis, Stavis & Kornfeld, LLP, New York, New York, for Defendant.

Helen Cantwell, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York, New York, for U.S.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

In December 1999, Carlos Gonzalez was charged in a fourteen count indictment and was subsequently extradited from Colombia. Gonzalez now moves to dismiss various counts of the indictment on the grounds that certain charges subject him to life imprisonment, contrary to the extradition agreement between Colombia and the United States, and in violation of the "doctrine of specialty."[1] Oral argument was held on July 10, 2003, at which time I denied Gonzalez's motion in its entirety, but expressed a willingness to reconsider the substance of the motion at sentencing, if Gonzalez is convicted. I write now to more fully explain the reasons for that decision.

## I. BACKGROUND

The following facts, taken from the parties' briefs, are wholly undisputed.

### A. The Restrepo Organization

Between 1996 and 1999, Gonzalez was allegedly a member of a criminal organization led by Alex Restrepo that was responsible for a chain of approximately 50 armed robberies throughout the New York City metropolitan region. Among the crimes that Gonzalez is charged with are: the February 1996 armed robbery and attempted murder of two jewelers near the Hilton Hotel in midtown Manhattan; the February 1997 armed robbery of a Bravo Supermarket employee in Jackson Heights; the May 1999 robbery of a Kay Jewelers factory store in Union Township, New Jersey; and the August 27, 1999, robbery of the American Sirloin Meat Company in the Bronx, during which Restrepo shot and killed one of the meat company's employees, a retired New York City Police Department detective. On October 26, 1999, a Southern District grand jury returned a one count indictment against Gonzalez and various other members of the Restrepo organization, charging a violation of 18 U.S.C. § 1951 (the Hobbs Act). A fourteen count superseding indictment was returned on December 28, 1999.[2]

---

1. Gonzalez's co-defendant Jorge Garcia joined in the instant motion, but subsequently pled guilty and withdrew the motion. *See* 6/17/03 Transcript of Guilty Plea before Hon. Gabriel W. Gorenstein at 20. He did, however, reserve the right to re-argue the substance of this motion at his sentencing. *See id.* at 9 ("It's our position that because of the extradition treaty that the Judge does not have the power to impose a life sentence but would have to impose a term of years, but we understand that we may be wrong. The important thing today is that—which was resolved by Judge Scheindlin—is that a life sentence is

certainly not mandatory.") (Statement of David Gordon, counsel to Jorge Garcia).

2. The superseding indictment charged: (1) participation in the conduct of the affairs of the Restrepo organization through a pattern of racketeering activity, under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) RICO conspiracy, 18 U.S.C. § 1962(d); (3) five counts of using a firearm during the commission of crimes of violence, 18 U.S.C. § 924(c); (4) three counts of robbery, conspiracy to commit robbery, 18 U.S.C. § 1951, and at-

### B. The Arrest and Extradition of Gonzalez

On March 13, 2002, Gonzalez was arrested in Colombia pursuant to a provisional arrest warrant and detained there pending extradition to the United States. In May 2002, the United States government (via the Department of Justice's Office of International Affairs) formally requested the extradition of Gonzalez. *See* 5/10/02 Diplomatic Note No. 575, Ex. A to the 4/29/03 Affidavit of Roger L. Stavis ("Stavis Aff."), counsel to Gonzalez. Although the United States and Colombia have no extradition treaty, the request was made pursuant to a December 1997 Colombian constitutional amendment allowing extradition to the United States.

By an opinion of the Colombian Supreme Court dated September 24, 2002, and a resolution of the Colombian government passing Articles of Extradition dated October 18, 2002, Colombia granted extradition of Gonzalez to the United States on some, but not all, of the charges filed in the superseding indictment.[3] In particular, the resolution stated:

> "[A] person shall only be turned over in extradition to a requesting State . . . on the condition that the extradited individual is not subjected to forcible disappearance, torture, cruel, inhuman or degrading treatment or punishment, nor to the penalties of deportation, *life imprisonment,* [or] asset forfeiture, as provided in articles 11, 12 and 34 of the Feder-

al Constitution." (*This is of particular importance.*)

> *Therefore, the turning over of [Gonzalez] shall so be ordered, on the condition that the requesting country agree to the specific conditions mentioned above.*

\* \* \* \* \* \*

> **ARTICLE FOUR:** To order the turning over of a Colombian citizen, [Gonzalez], *on the condition that the requesting country comply with the conditions* included in subsection 2 of article 512 (formerly article 550) of the Criminal Procedure Code, having previously advised it of the ruling of the Constitutional Court in its decision C–1106 of August 24, 2000, [to wit, that Gonzalez shall not be subject to life imprisonment].

10/18/02 Articles of Extradition (emphasis added) (quoting 8/24/00 Opinion C–11106[4] of the Colombian Constitutional Court, interpreting former article 550 of the Colombian Criminal Procedure Code) at 10, 12, Ex. C to the Stavis Aff.

Shortly after Colombia passed these Articles of Extradition, on October 29, 2002, I sentenced Alex Restrepo to life imprisonment. *See* 10/29/02 Sentencing Transcript, *United States v. Restrepo,* 99 Cr. 1113 (S.D.N.Y.) ("Restrepo Tr."). Restrepo was indited for the same crimes as Gonzalez, and had previously been extradited from Colombia pursuant to nearly identical Articles of Extradition.

Shortly thereafter, on November 19, 2002, the Colombian Ministry of Foreign

---

tempted murder, 18 U.S.C. § 1959, in connection with the Hilton Hotel robbery; and (5) five counts of robbery, conspiracy to commit robbery, 18 U.S.C. § 1951, and murder, 18 U.S.C. § 1959, in connection with the American Sirloin Meat Company robbery.

**3.** Colombia refused to extradite Gonzalez for conduct that occurred prior to December 17, 1997, the effective date of the Colombian extradition law. It also refused to extradite

Gonzalez, under the principle of "dual incrimination," for several charges not punishable by a minimum sentence of at least four years' imprisonment.

**4.** The Articles of Extradition refers to the Colombian Court's August 24, 2000, decision alternatively as Opinion C–11106 and as Opinion C–1106. Not having access to that original opinion, it is impossible to tell which is the correct designation.

Relations forwarded Gonzalez's Articles of Extradition to the United States and formally requested that the United States provide assurances that Gonzalez would not be subject to a sentence of life imprisonment if convicted. *See* 11/19/02 Letter from Colombian Ministry of Foreign Affairs to United States Embassy, Ex. D to the Stavis Aff. In response, the United States issued a diplomatic note:

> After due consideration, the Government of the United States assures the Government of Colombia that, should [Gonzalez] be convicted of the offenses for which extradition has been granted, the United States *executive authority*, with the agreement of the attorney for the accused, will not seek a penalty of life imprisonment at the sentencing phase of the judicial proceeding in this case. The Government of the United States also assures the Government of Colombia that, should the competent United States *judicial authority* nevertheless impose a sentence of life imprisonment against [Gonzalez], the United States executive authority will take appropriate action to formally request that the court reduce such sentence to a term of years.

12/30/02 Diplomatic Note No.1967 (the "Diplomatic Note") (emphasis added), Ex. E to the Stavis Aff. (An identical diplomatic note had been sent months earlier in response to Restrepo's Articles of Extradition.) On February 5, 2003, Gonzalez was released into the custody of the United States Marshals Service for transport to the United States.

Gonzalez now moves to dismiss those counts of the superseding indictment that, assuming he is convicted, subject him to mandatory sentences of life imprisonment. In particular, Gonzalez is charged with one count each of murder and felony murder in aid of racketeering activity, which is punishable "by death or life imprisonment." 18 U.S.C. § 1959(a)(1). In addition, he is charged with one count each of RICO, 18 U.S.C. § 1962(c), and RICO conspiracy, 18 U.S.C. § 1962(d), which require a sentence of life imprisonment "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). Because racketeering acts five and six (respectively, murder and narcotics conspiracy) carry a maximum sentence of life imprisonment, a conviction on either of the RICO counts will also *necessarily* result in a sentence of life imprisonment.[5] Thus, Gonzalez moves to dismiss counts 13 and 14 of the indictment (charging murder and felony murder), and to strike racketeering acts five and six (charging murder and narcotics conspiracy) from the RICO counts in the superseding indictment.

## II. APPLICABLE LAW

■ "It is well established that, under the international principle of specialty, an extradited defendant may not be tried for a crime not enumerated in the applicable extradition treaty." *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir.2002).[6] *See generally United States v. Rauscher*, 119 U.S. 407, 419–420, 424, 7 S.Ct. 234, 30 L.Ed. 425 (1886) (first establishing doctrine of specialty). *See also* Restatement (Third) of Foreign Relations § 477 (1987) ("Under most international agreements,

---

**5.** In its opinion, the Colombian court noted that certain of the indicted offenses were punishable by *maximum* penalties of life imprisonment, but there is no indication that it was aware that the *mandatory* sentence would be life imprisonment. *See* 9/24/02 Opinion of the Supreme Court of Justice Criminal Court of Appeals of Colombia at 11 (the "Opinion"), Ex. B to the Stavis Aff.

**6.** Although, as noted, Colombia and the United States are not parties to an extradition treaty, the parties agree that the doctrine of specialty applies with equal force to the extradition agreements at issue here.

state laws, and state practice: (1) A person who has been extradited to another state will not, unless the requested state consents, (a) be tried by the requesting state for an offense other than one for which he was extradited; or (b) be given punishment more severe than was provided by the applicable law of the requesting state at the time of the request for extradition.").[7]

■ Based on principles of international comity, the doctrine of specialty requires the United States to guarantee that it will honor limitations placed on prosecutions of persons extradited to the United States so that it may protect its own citizens in prosecutions abroad. *See United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir. 1994) (citing *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir.1988)).

■ "We look to the language of the applicable treaty to determine the protection an extradited person is afforded under the doctrine of specialty." *Andonian*, 29 F.3d at 1435. In turn, whether an extradition treaty permits prosecution for a certain crime or imposes a certain condition specified in the extradition request "is a matter for the extraditing country to determine." *Campbell*, 300 F.3d at 209. *See also United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.1986) ("the protection [afforded by the doctrine of specialty] exists only to the extent that the surrendering country wishes"). "In determining whether the prosecution of [a defendant is] a breach of the extradition treaty, it is essential that we determine whether [the surrendering nation] would regard the prosecution as an affront to its sovereignty...." *United States v. Diwan*, 864 F.2d 715, 721 (11th Cir.1989).

■ Finally, in reviewing extradition agreements for potential violations, courts may consider whether the extraditing country has objected or would object to what actually took place after extradition. *See, e.g., Fiocconi v. Attorney General*, 462 F.2d 475, 481 (2d Cir.1972) (noting "the absence of any affirmative protest from [the surrendering country]" in finding no violation of the doctrine of specialty). Where no record of the extraditing nation's view exists or if the record is unclear, courts should look to the extradition decrees and any diplomatic correspondence in order to assess whether the extraditing country could have anticipated the result about which the defendant complains. *See United States v. Paroutian*, 299 F.2d 486, 491 (2d Cir.1962) (noting that appropriate consideration under doctrine of specialty is whether extraditing country would consider acts for which defendant was prosecuted as independent from those for which he was extradited).

## III. DISCUSSION [8]

■ Gonzalez argues that the counts of the superseding indictment (and the racke-

---

7. In Colombia, murder and felony murder are punishable by terms of imprisonment between thirteen and twenty-five years. *See* Opinion at 42 (citing article 511–1 of the Criminal Procedure Code). The maximum offense for any crime is 40 years' imprisonment.

8. The government argues, as an initial matter, that this motion is premature because "the District Court will be charged with the responsibility of determining the plain terms of [this] extradition agreement[ ] only at the time of sentencing." In support of this proposition, the government cites only *United States*

v. *Levy*, 947 F.2d 1032 (2d Cir.1991). Far from standing for the proposition that the doctrine of specialty may not be invoked until sentencing, the court held that "[t]he doctrine stands as a limitation against trial [ ] in the operational sense, common to all other dispositive issues assertable pre-trial, that *a ruling favorable to the defendant will result in dismissal without a trial.* But, unlike protections such as the Double Jeopardy Clause, the doctrine of specialty does not guarantee a right not to be tried, but rather a right to be protected from a court's authority." *Id.* at 1034 (emphasis added).

teering acts charged in the RICO counts) that subject him to life imprisonment must be dismissed because the Colombian government only extradited him on the condition that he not be subject to life imprisonment. Because Colombia would not view either trying Gonzalez on these charges or sentencing him to life imprisonment "as an affront to its sovereignty," *Diwan*, 864 F.2d at 721, his motion is denied. The plain language of the diplomatic correspondence indicates both that Colombia (a) intended Gonzalez to be tried on these charges, and (b) was aware that these offenses were punishable by life imprisonment *and* that the Court might impose that sentence.

There can be no question that Colombia explicitly extradited Gonzalez to stand trial on the charges he now seeks to dismiss. In its opinion, the Colombian court "rule[d] in favor of the extradition of [Gonzalez] ... for counts ONE (Racketeering Violations), TWO (Racketeering Conspiracy), ELEVEN (Robbery), TWELVE (Murder), and THIRTEEN (Felony Murder)...." Opinion at 49. Thus, dismissal of those charges would be the greater affront to Colombia's sovereignty.

There is also no question that Colombia was aware at the time that it extradited Gonzalez that the crimes for which he was extradited were punishable by life imprisonment. *See* Opinion at 11–12 ("the maximum penalty for a violation of Title 18, United States Code, Section 1962 is currently life imprisonment ... [t]he maximum penalty for a violation of Title 18, United States Code, Section 1959(a)(1) is currently death or life imprisonment").

The only remotely close question is whether Colombia was aware that, notwithstanding any assurances made by the Executive, the Court was free to impose that maximum penalty. But even this question is not seriously in dispute.

*First*, courts that have considered the doctrine of specialty historically read extradition agreements and accompanying diplomatic notes very literally, applying canons of statutory and treaty construction. *See, e.g., Campbell*, 300 F.3d at 211–12. That being so, the "assurances" made in the Diplomatic Note make plain that the Executive only agreed that *it* would not "*seek* a penalty of life imprisonment at the sentencing phase of the judicial proceeding in this case." Diplomatic Note (emphasis added). Moreover, the Diplomatic Note explicitly recognizes the possibility that the Court (*i.e.*, the "judicial authority") could "nevertheless impose a sentence of life imprisonment," in which case the Executive would "request"—not demand, require, insist or impose—a reduction in that sentence. *Id.* Thus, the plain language of the Diplomatic Note makes no guarantees that a sentence of life imprisonment will not be *imposed*.

*Second*, the equivocal nature of the government's "assurance" is highlighted in contrast to the assurance made regarding the death penalty. In the case of the death penalty, the United States promised that "the death penalty will not be sought or imposed in this case." *Id.* (emphasis added). Thus, any concern that Colombian officials might not have appreciated nuances in the English language, or that such differences were lost in translation, should be dispelled. There can be no question that the assurance made with respect to life imprisonment is not the same ironclad guarantee that was made with respect to the death penalty.

*Third*, Alex Restrepo, a co-defendant previously extradited from Colombia, had been sentenced to life imprisonment on substantially the same charges with the identical assurance just months prior to Gonzalez's extradition. *See* Restrepo Tr. The Colombian government was fully

aware of the Restrepo sentencing, but nevertheless chose to extradite Gonzalez. *See* 7/10/03 Oral Argument Transcript ("7/10/03 Tr.") at 9–10 (Statement of AUSA Helen Cantwell).[9]

*Fourth,* in connection with the Restrepo sentencing, AUSA Cantwell stated that she "spoke[ ] with representatives of the Office of International Affairs, who are responsible for the Department of Justice's negotiations with Colombia through the State Department.... In their view, it has been made clear to the Colombians that this particular Diplomatic Note does not bind the judiciary.... [There is] no reason to believe that based on this Diplomatic Note there is any type of a double-cross going on or that with respect to this extradition Colombia was fooled into thinking he couldn't get a life sentence." Restrepo Tr. at 19–20. Presumably the same still holds true.[10]

In the face of all this, Colombia still extradited Gonzalez. The only reasonable conclusion is that it recognized, and accepted, the possibility that Gonzalez would receive a life sentence. *See Paroutian,* 299 F.2d at 491 (holding that courts should look to the extradition decrees and any diplomatic correspondence in order to assess whether the extraditing country could

have anticipated the result about which the defendant complains.).

The only evidence Gonzalez marshals on his behalf, other than the admittedly strong language used in the Articles of Extradition, is a letter from Jamie Buenhora Febres–Cordero, the Colombian Consul General, dated March 27, 2003, in response to an inquiry from Gonzalez's counsel explaining the certainty that Gonzalez would receive a life imprisonment. *See* Stavis Aff. ¶ 16. Mr. Febres–Cordero's letter simply forwarded a highlighted copy of the Diplomatic Note "which contains the position of the Colombian Government in regards to Mr. [Gonzalez's] extradition." *See* Ex. F to the Stavis Aff.[11] This can hardly be called an objection or "affirmative protest." *Fiocconi,* 462 F.2d at 481. To the contrary, upon being informed that Gonzalez would necessarily receive a sentence of life imprisonment, the Colombian government merely resent the Diplomatic Note, which strongly indicates that it recognizes the Court's authority to impose that sentence. Colombia was given a clear opportunity to object to the imposition of a sentence of life imprisonment, and declined. That being so, the only reasonable conclusion is that Colombia recognized, and accepted,

---

9. In addition, at least one other defendant extradited from Colombia had previously been sentenced to life imprisonment by an American court. *See United States v. Lehder–Rivas,* 955 F.2d 1510, 1521 (11th Cir.1992) (sentence of life plus 135 years did not violate terms of Colombian extradition).

10. At oral argument, the government indicated that there is now "concern in Colombia that another defendant would face a life sentence." Tr. at 9. However, the Colombian government has not sought to intervene in these proceedings or otherwise formally weigh in on Gonzalez's sentence. In addition, the government indicates here that Colombia would be receptive to *any* term of years, including one effectively imposing a life sentence (*e.g.,* a sentence of 200 years). *See*

Tr. at 11. Thus, at best, it can be said that Colombia now has "concerns" about the Court imposing a technical sentence of life, even though it has no such concerns about a functional life sentence. Nor can it be said that Colombia would consider a life sentence to be a violation of the extradition agreement, only that it would prefer a term of years.

11. In addition, Mr. Stavis reports that he spoke to Yohanna Warticovschi, the Consul of Legal Affairs of the Colombian Consulate in New York, who stated that she was unaware of the mandatory nature of the life sentences, and that the Colombian government "understood that its citizen would not receive a sentence of life imprisonment." Stavis Aff. ¶ 17.

the possibility that Gonzalez would receive a life sentence.

## IV. CONCLUSION

The charges in the superseding indictment that subject Gonzalez to a term of life imprisonment if convicted will not be dismissed; to do so would permit Gonzalez to evade charges on which he was both indicted and extradited. Moreover, because Colombia was plainly aware of the Court's authority to sentence Gonzalez to life and the real possibility that it would happen, there is no need to worry that such a sentence would be an "affront to its sovereignty." *Diwan*, 864 F.2d at 721. Nonetheless, I recognize my ability to depart from a term of life imprisonment in favor of a term of years, *see Campbell*, 300 F.3d at 206, and will consider the proper sentence if it becomes necessary.[12]

SO ORDERED.

---

12. Gonzalez argues that this Court has no authority, based on the Articles of Extradition, to impose a sentence below that mandated by statute because, unlike in *Campbell*, Gonzalez was extradited pursuant to an agreement, not a treaty. Although a treaty trumps laws enacted by Congress, Gonzalez argues that agreements entered into by the Executive alone do not. Thus, dismissing the charges is the only way to ensure that he will not be subject to life imprisonment. But I have already twice rejected this argument, holding that the extradition agreement and chain of diplomatic correspondence are akin to a treaty. *See* 6/13/03 Transcript, *United States v. Garcia*, 99 Cr. 1113 (S.D.N.Y.) at 13–14 ("I'm not required to give life because of the terms of this [diplomatic] note. I can. That's what happened in the Restrepo sentence. I felt I had also the authority to give life if I wanted to, but I am permitted not to ... I recognize my authority not to give life, regardless of what [18 U.S.C. § ] 1963(a) requires."); 7/10/03 Tr. at 21 ("I am not mandated to give a life sentence if [Gonzalez] is convicted, because I think the terms of these notes and negotiations will allow me to not impose a statutory requirement of life."). *See also Campbell*, 300 F.3d at 209 (relying on diplomatic notes and correspondence to determine that Costa Rico imposed condition of 50 year maximum sentence).